UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BGC INC., <br><br>  Plaintiff, <br><br> v. <br><br> RAUHMEL FOX ROBINSON, et al., <br><br>  Defendants. | Case No. 22-cv-01582-JSW <br><br> **ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** <br><br> Re: Dkt. No. 33 |

Now before the Court for consideration is the motion for a preliminary injunction filed by Plaintiff BGC Inc. ("BGC"). Defendants, Rauhmel Fox Robinson ("Robinson") and Black Girls Code Inc. ("BG Code") (collectively "Defendants") oppose the motion and have requested that the Court defer a ruling to permit them to engage in discovery. The Court has considered the parties' papers, relevant legal authority, and the record in this case, and it HEREBY GRANTS BGC's motion, and DENIES Defendants' request to reserve a ruling to permit discovery.[1]

**BACKGROUND**

BGC, which was founded by Kimberly Bryant and previously incorporated under the name "Black Girls Code Inc.", is a non-profit organization founded to advance equal representation for Black women in the technology sector."[2]  (Compl. ¶¶ 1-2, Exs. 4-5.)  To advance its goals, BGC offers one day workshops, enrichment activities, summer camps, and code clubs, which take place throughout the year and are led by tech professionals and influencers. (*Id.* ¶ 21; *see also*

---

[1] The Court finds good cause to GRANT BGC's request to file its reply brief one day after the deadline expired.

[2] When the Court uses the term "BGC", it is referring to the organization originally incorporated as Black Girls Code Inc. and revived as BGC.

1

1  Declaration of Sofia Mohammed ("Mohammed Decl."), ¶¶ 3-5.)  Since it was established in 2011,
2  over 10,000 girls have participated in its programs.  (Compl. ¶ 21; Mohammed Decl., ¶ 2 (attesting
3  that BGC has served approximately 30,000 girls.))

4  BGC alleges it owns trademark rights in "Black Girls Code" (the "Mark") under the
5  common law and pursuant to U.S. Federal Trademark Registration No. 6,145,379, which covers
6  the Mark in connection charitable fundraising, education services, and charitable services.
7  (Compl. ¶¶ 25-26, Ex. 1 ("Registration"), Exs. 4-5; *see also* Declaration of Tamany Vinson Bentz
8  ("Bentz Decl.") ¶ 6, Ex. 5.)[3]  In late 2021, BGC's corporate registration lapsed.  (Compl. ¶ 2; *see*
9  *also* Defendants' Request for Judicial Notice ("Def. RJN"), Ex. 8.)  On January 11, 2022,
10 Robinson registered BG Code as an exempt organization with the Delaware Department of State
11 and then registered it to do business in California.  (Compl. ¶ 28, Ex. 2; Bentz Decl., ¶ 7, Ex. 6;
12 Def. RJN, Exs. 1-3)  As a result, BGC was not able to renew its corporate registration under its
13 original name and renewed the registration under BGC Inc.  (Compl. ¶¶ 2, 25 & n.1, 28, Def. RJN,
14 Ex. 8.)

15 BGC alleges and has submitted evidence that Defendants use the Mark on a website and on
16 social media posts in connection with the same services that BGC provides.  (Compl. ¶¶ 29-30,
17 33-35; *see also, e.g.,* Bentz Decl., ¶¶ 8-15, Exs. 7-16.)  BGC also includes evidence that Robinson
18 has stated he is BGC's new leadership and that BG Code is "upgraded" from BGC.  (Compl. ¶¶
19 32; Bentz Decl. ¶¶ 9, 12, Exs. 8, 11.)  BGC also argues that, although Defendants state they are
20 "training 10,000 volunteer iOS developers to code iOS mobile applications for" BG Code, they
21 have asked these "volunteers" to pay $250.00.  At least some of the exhibits included with BGC's
22 motion show a price option of "$0-250.00"  (*See* Compl. ¶ 36, Ex. 14; Bentz Decl., ¶¶ 13-15, Exs.
23 12-16.)

24 On March 14, 2022, BGC filed its complaint, in which it alleges that Defendants are
25 infringing the Mark.  On April 18, 2022, BGC filed an application for a temporary restraining
26 order ("TRO").   The parties resolved that application by stipulation.  BGC agreed to withdraw the

---

[3]  Defendants object to Exhibits 42 through 44 of Ms. Bentz's declaration.  The Court did not rely on those exhibits to resolve the motion, and it OVERRULES the objections as moot.

application for a TRO, and Defendants agreed to:

> not make any use of the BLACK GIRLS CODE Mark, as that term is defined in paragraph 26 of the Complaint, or any mark confusingly similar to the BLACK GIRLS CODE Mark, in connection with any in-person event of any sort, including but not limited to classes, trainings, meetings presentations, and conferences, until the earlier of (1) this proceeding settling to the mutual satisfaction of the parties or (2) if the parties are unable to reach a mutually agreeable settlement, the Court issuing a decision on a subsequent motion for a preliminary injunction filed by Plaintiff in this proceeding[.]

(Dkt. No. 20.)

On May 6, 2022, Defendants moved to dismiss. On June 2, 2022, BGC filed its motion for a preliminary injunction, asserting that Defendants violated the stipulation. On June 9, 2022, Defendants moved for a protective order from discovery and also asked the Court to vacate the briefing schedule and hearing on the motion for a preliminary injunction, asserting they would require discovery to properly oppose the motion. The Court advised the parties that it intended to deny Defendants' motion and denied Defendants' request to vacate the briefing schedule and hearing on the motion for a preliminary injunction, without prejudice to renewing their request for discovery in the opposition.

On June 30, 2022, the Court denied, in part, the motion to dismiss and determined BGC alleged sufficient facts to show it has standing and to support its claims against Robinson. However, the Court dismissed BGC's claim for intentional interference with prospective business relations, with leave to amend. The Court will address additional facts as necessary in the analysis.

**ANALYSIS**

A.  **Applicable Legal Standards.**

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is never awarded as of right. *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008) (internal citations omitted). In order to obtain such relief, a plaintiff must establish: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council,*

3

*Inc.*, 555 U.S. 7, 20 (2008).  In *Alliance for the Wild Rockies v. Cottrell,* the Ninth Circuit held that the "serious questions" sliding scale approach survives *Winter*.  632 F.3d 1127, 1134-35 (9th Cir. 2011).  Thus, a court may grant a request for a preliminary injunction if a plaintiff demonstrates that there are serious questions going to the merits and a hardship balance that tips sharply in their favor, "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Id.* at 1135.

"For the purposes of injunctive relief, 'serious questions' refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo."  *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).  Serious questions are "substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation."  *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1952).  Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a "fair chance of success on the merits."  *Nat'l Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985).

**B.     The Court Denies Defendants' Request for Discovery.**

Defendants focuses primarily on the issue of ownership of the Mark, and they renew their request for discovery on that issue.  BGC opposes the request for discovery prior to a ruling on this motion.  There is no evidence in the record to show that Defendants' use of the mark pre-dated BGC's use.  *See, e.g., Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219-20 (9th Cir. 1996).  In addition, the Court concludes the evidentiary record for purposes of this motion is sufficient to show that BGC has standing to enforce the mark.  *See, e.g.,* 15 U.S.C. § 1055.  Accordingly, the Court DENIES Defendants' request for discovery prior to a ruling.  However, as this litigation proceeds, nothing in this Order shall preclude Defendants from seeking to dissolve the injunction based on discovery.

//

//

4

**C.    The Court Grants the Motion.**

   **1.    BGC Has Established A Likelihood of Success on the Merits.**

In order to prevail on its claims for trademark infringement and unfair competition under both federal and state law, BGC must show it "owns a valid mark, and thus a protectable interest," and that Defendants' conduct is likely to cause confusion. *See Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1196 (9th Cir. 2009); *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994). For the reasons articulated in the Court's Order denying Defendants' motion to dismiss for lack of standing, the Court concludes BGC is likely to establish it is the owner of the Mark.[4] (Order Granting in Part and Denying in Part Motion to Dismiss at 5:1-6:18 (citing, *inter alia*, *AECOM Energy and Construction, Inc. v. Morrison Knudson Corp.*, 851 Fed. Appx. 20, 21 (9th Cir. 2021) (holding plaintiff had standing where record demonstrated original entity owning the mark became plaintiff through various name changes).)

In general, courts consider eight factors in assessing whether a defendant's use of a mark is likely to confuse consumers: "(1) the similarity of the marks; (2) the strength of the plaintiff's mark; (3) the proximity or relatedness of the goods or services; (4) the defendant's intent in selecting the mark; (5) evidence of actual confusion; (6) the marketing channels used; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers of the defendant's product." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010) (citing *AMF v. Sleekcraft Boats*, 599 F.2d 342, 348-49 (9th Cir. 1979) ("*Sleekcraft*")). Defendants have not addressed these factors, and the Court treats that as a concession. *See, e.g., Allen v. Dollar Tree Stores, Inc.,* 475 Fed. Appx. 159, 159 (9th Cir. 2012); *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005). For the sake of completeness, the Court has independently evaluated the *Sleekcraft* factors and concludes BGC is likely to succeed on this element of its claims.

*Sleekcraft's* "eight-factor analysis is 'pliant,' illustrative rather than exhaustive, and best

---

[4]    Assuming for the sake of argument that BGC has not established a likelihood of success on this element, the Court concludes it has raised serious questions going to the merits.

5

understood as simply providing helpful guideposts." *Fortune Dynamic*, 618 F.3d at 1030. "The ultimate question of likelihood of confusion 'is predominantly factual in nature,' as is each factor within the *Sleekcraft* likelihood of confusion test." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002) (quoting *Wendt v. Host Intern., Inc.*, 125 F.3d 806, 812 (9th Cir. 1997)). In the context of the internet, the "trinity" of the (1) the similarity of the marks, (2) the relatedness of the goods or services, and (3) the simultaneous use of the Web as a marketing channel, "constitutes the most crucial body of the *Sleekcraft* analysis." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (quoting *Brookfield Commc'ns. v. West Coast Ent.*, 174 F.3d 1036, 1054 n.16 (9th Cir. 1999)), *overruled on other grounds by Winter*, 555 U.S. at 27.

Although the USPTO initially refused BGC's registration of the Mark in 2020, the USPTO subsequently approved the registration based on BGC's argument that the Mark had acquired secondary meaning through prior use. That approval was subject to a disclaimer that BGC did not claim an exclusive right to use "CODE" in Class 42. (Defs. RJN, Exs. 12-14; *see also* Reply Declaration of Tamany Vinson Bentz, ¶ 5, Ex. 1.) The Registration supports a conclusion that the Mark has acquired some distinctiveness. *Lahoti*, 586 F.3d at 1199. BGC also has received a number of awards and grants from companies such as Nike and Microsoft. (*See* Compl. ¶ 22, Exs. 4-7; Bentz Decl., ¶¶ 2-3, 5, Exs. 1-2, 4.) Assuming for purposes of this motion that the Mark is descriptive, a "conceptually weak [mark] can have its overall strength as a mark bolstered by its commercial success." *M2 Software, Inc. v. Madacy Entmt.*, 421 F.3d 1073, 1081 (9th Cir. 2005); *see also Brookfield Commc'ns.*, 174 F.3d at 1058.

The record also shows that BGC's Mark and Defendants' use of that Mark are identical in sight, sound, and meaning. Defendants have used a logo in connection with the Mark, which could serve to distinguish their use of the Mark from BGC's use. However, Defendants do not always make use of that feature. *Cf. Sleekcraft*, 599 F.2d at 351 (noting that the defendant's use of a distinctive logo helped to negate similarities but was not used consistently). Moreover, it is undisputed that the parties use the Mark in connection with the same services and utilize the internet to promote and advertise those services. The Court concludes that BGC's showing on the

"trinity" of the *Sleekcraft* factors strongly suggest that confusion is likely. *GoTo.com*, 202 F.3d at 1205.

Defendants also do not refute BGC's evidence that Robinson stated that "Black Girls Code" has "new leadership" and has been "upgraded". Those statements demonstrate that Defendants were aware of BGC's use of the Mark and adopted it during the period the corporation was suspended, a factor that also weighs in favor of confusion. *See Brookfield*, 174 F.3d at 1059 ("This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark."). The Court concludes that each of these factors weighs heavily in favor of BGC and would outweigh the other *Sleekcraft* factors.

Accordingly, the Court concludes BGC has met its burden to show it is likely to succeed on the merits of its trademark and unfair competition claims. In addition to failing to address likelihood of confusion, Defendants did not address the remaining *Winter* factors. *See Allen,* 475 Fed. Appx. at 159; *Jenkins*, 398 F.3d at 1095 n.4. For the sake of completeness, the Court has independently analyzed each factor and, for the reasons set forth below, conclude they weigh in favor of granting an injunction.

**2.      BGC Has Met Its Burden to Show Irreparable Harm.**

When a court finds a plaintiff has established it is likely to succeed on the merits of a claim for trademark infringement, the plaintiff is entitled to a "rebuttable presumption of irreparable harm[.]" 15 U.S.C. § 1116(a). Because the Court has concluded BGC is likely to succeed on the merits, it applies the presumption. Defendants respond only that BGC has not come forth with any evidence of actual confusion or actual harm based on Defendants' use of the Mark. BGC did raise concerns about conduct that might tarnish the Mark, but Defendants put forth evidence to dispute BGC's assertion that Robinson is hosting events in his home. In addition, the evidence regarding those events also state that minors must be accompanied by a parent or guardian and were posted before the parties entered into the stipulation. (*See, e.g.,* Bentz Decl., ¶ 17, Ex. 18.)

BGC is entitled to a presumption of irreparable harm, and the Court concludes that Defendants' arguments do not rebut that presumption. Rather, the Court takes those arguments into consideration in connection with the balance of the equities and in connection with the scope

7

of the injunction to be issued.

### 3. Balance of Equities.

"Courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. To the extent Defendants have addressed this factor, they argue that it would be an extreme hardship if they were required to change their name before the litigation has concluded. As noted above, the record does not demonstrate that any events hosted by Defendants have been held at Robinson's residence or without adult supervision. However, there is some evidence in the record to support the conclusion that Defendants have not merely asked for donations but are asking volunteers to pay to participate in Defendants' venture. In addition, although BGC's corporate registration lapsed, Defendants had prior knowledge of BGC's Mark, which strongly supports a conclusion that they are trading on the goodwill in the Mark that has been built by BGC.

Accordingly, the Court concludes BGC has shown the balance of equities weigh in its favor. *See, e.g., 2Die4Kourt v. Hillair Capital Mgmt.*, 692 Fed. Appx. 366, 369 (9th Cir. 2017) ("[W]hen the harm complained of results from a defendant's allegedly infringing conduct, we have nonetheless approved the entry of a preliminary injunction."); *Cadence Design Sys. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) (stating defendant who knowingly infringes another's copyright "cannot complain" when properly required to cease infringing activities); *Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1333 (7th Cir. 1977) (cited with approval in *Cadence Design*) (noting that courts generally do not hesitate to issue injunctions where the failure to do so "would be to aid a second comer who has sought to trade upon the efforts and good will of the first comer").

### 4. Public Interest.

Again, Defendants have not substantively addressed this factor, but "the consuming public is equally injured by an inadequate judicial response to trademark infringement." *Playboy Enters., Inc. v. Baccarat Clothing Co.,* 692 F.2d 1272, 1275 (9th Cir. 1982) ("In addition to the harm caused the trademark owner, the consuming public is equally injured by an inadequate judicial response to trademark infringement."); *see also Am. Rena Int'l Corp. v. SisJoyce Int'l Co. Ltd.,*

8

1  534 Fed. Appx. 633, 636 (9th Cir. 2013) (affirming preliminary injunction) ("An injunction that prevents consumer confusion in trademark cases ... serves the public interest.").

Accordingly, the Court concludes that the public interest weighs in favor of an injunction.

**5.     Bond.**

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). That rule provides a court "with discretion as to the amount of security required, if any." *Barahona–Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). If there is no evidence that a defendant would be damaged by an injunction, a court may set the amount at zero. *See, e.g., Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills,* 321 F.3d 878, 882 (9th Cir. 2003).

Because Defendants have focused solely on BGC's ability to prevail on the merits and their request for discovery, they have not addressed what specific damage they might suffer from the imposition of an injunction. However, the Court finds that a nominal bond is appropriate and will require BGC to post a bond in the amount of $1,000.00.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS BGC's motion for a preliminary injunction. Defendants have suggested that BGC is asking it to formally change its corporate name. That is not what BGC asks. Defendants also complain that they should not be precluded from using the Mark to conduct business. For the reasons discussed in connection with the Court's analysis of the balance of the equities, based on the facts of this case, those complaints ring hollow. At this juncture, however, will neither require Defendants to change their corporate name nor give up ownership of their URLs or Twitter handles.

Accordingly, pursuant to Federal Rule of Civil Procedure 65, Defendants and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with Defendants are HEREBY ENJOINED from:

a.     using, imitating, copying, or making any other infringing use of the BLACK GIRLS CODE Mark and any other mark now or hereafter confusingly similar or identical to the

9

BLACK GIRLS CODE Mark;

  b. manufacturing, assembling, producing, distributing, offering for distribution, circulating, selling, offering for sale, advertising, importing, promoting, or displaying any simulation, reproduction, counterfeit, copy, or colorable imitation of the BLACK GIRLS CODE Mark or any mark confusingly similar thereto;

  c. using any false designation of origin or false description or statement which can or is likely to lead the trade or public or individuals erroneously to believe that any good or service has been provided, produced, distributed, offered for distribution, circulation, sold, offered for sale, imported, advertised, promoted, displayed, licensed, sponsored, approved, or authorized by or for BGC, when such is not true in fact;

  d. using the names, logos, or other variations thereof of the BLACK GIRLS CODE Mark in any of Defendants' trade or corporate names to advertise or market their services, but, at this juncture, Defendants are not required to change their corporate name;

  e. using or operating any domain name or URL incorporating "BLACK GIRLS CODE," including but not limited to https://www.blackgirlscodeinc.org and https://twitter.com/BlackGirlsCode, or any mark identical or confusingly similar to the BLACK GIRLS CODE Mark to advertise or market their services, but Defendants are not required at this stage of the litigation to give up these URLs or Twitter handles;

  f. engaging in any other activity constituting an infringement of the BLACK GIRLS CODE Mark, or of BGC's rights in, or right to use or to exploit the Mark, including but not limited to posting event on the Eventbrite.com website under the BLACK GIRLS CODE Mark; and

  g. assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (f) above.

//
//
//
//

This injunction shall take effect upon posting of the security required and shall remain in effect for the pendency of this proceeding or until it is dissolved by the Court.

**IT IS SO ORDERED**.

Dated: July 25, 2022

_____
JEFFREY S. WHITE
United States District Judge